Opinion issued October 30, 2008
 

 














In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-06-01086-CR

____________


DAVID HENRY TUCK, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from 209th District Court

Harris County, Texas

Trial Court Cause No. 1066387






MEMORANDUM OPINION


 A jury convicted appellant, David Henry Tuck, of the offense of aggravated
sexual assault, enhanced by a prior juvenile conviction for aggravated assault with a
deadly weapon. The indictment alleged that appellant caused the penetration of the
anus of D.R. by (1) using or exhibiting a pipe as a deadly weapon, and (2) causing
serious bodily injury or death. Appellant was sentenced to a term of life
imprisonment plus a $10,000.00 fine. 

 In four points of error, appellant contends that the trial court erred in (1)
failing to submit to the jury a lesser charge on aggravated assault, (2) overruling
appellant's motion for mistrial because the prosecutor's final argument in the guilt-innocence phase of trial was outside the record, (3) admitting evidence of appellant's
tattoos, swastikas, white supremacy and skinhead affiliation over appellant's
objection, and (4) denying the appellant's motion to suppress two of his oral
statements. We affirm.

I. Factual Background (1)

 In April of 2006, 16-year-old G.S. and his friend, 18-year-old D.R. went to the
crawfish festival in Old Town Spring. The pair had been using drugs and alcohol. 
They met up with appellant and Keith Turner. G.S. had known Turner for a period
of months, but had only recently met appellant. Later, G.S.'s mother drove all four
of them to G.S.'s home. G.S.'s mother left the house for the store, leaving the four
males alone with G.S.'s 13-year-old sister, D.S., and her friend H.K. 

 G.S. and his three guests consumed more alcohol and drugs and became
intoxicated. According to G.S., appellant and D.R. had a confrontation during which 
appellant said "something about a wetback." D.R., who was Hispanic, took offense
to the comment and confronted appellant. G.S. told them to both calm down and
smoke some more marihuana.

 During most of the evening G.S.'s little sister and her friend stayed upstairs in
her room, but occasionally D.S. came downstairs to ask her brother questions. At one
point, she informed G.S. in front of appellant and Turner that D.R. had tried to kiss
her. When appellant heard this allegation, he became angry and he hit D.R. in the
face with his fist. D.R. fell and appeared to be unconscious. 

 Appellant and Turner dragged D.R. out to the backyard, where Turner started
punching him. G.S. hit D.R. in the chest. After D.R. fell, appellant, who was wearing
steel-toed boots, kicked him in the head and torso about 10 times. D.S.'s friend,
H.K., testified that D.S. told her she also kicked D.R. and had injured her toe. While
attacking the complainant, appellant uttered the terms "white power," "wetback" and
"beaner." This assault lasted about 10 or 15 minutes. 

 Appellant and Turner then removed all of D.R.'s clothes. G.S. testified that
while the two were stripping D.R. of his clothes, appellant told G.S., "if you were
white, you would be helping me." 

 Appellant and Turner burned D.R.'s chest with a cigarette, and then appellant
slashed him on the chest with his knife. Turner retrieved an umbrella pole from the
patio furniture and placed the sharp end on D.R.'s anus. Using the bottom of his
boot, appellant kicked the pole eight to ten inches into D.R.'s anus. 

 Appellant and Turner then dragged D.R. to the back of the yard near the fence
with the umbrella pole still lodged in his anus. They then poured bleach all over
D.R.'s body and face. Turner then tried to burn D.R.'s clothing in the barbeque pit. 

 G.S., who had watched the entire assault, was in fear that the pair would kill
his sister and mother if G.S. told the police. (2) G.S. decided to go to sleep. Turner and
appellant left D.R. in the backyard and went inside the house and into G.S.'s room. 

 The next morning, G.S. went outside to smoke a cigarette, and saw D.R. still
on the ground. G.S. put some clothes on D.R. and helped walk him to the kitchen. 
G.S. woke up his mother and she called "911." An ambulance arrived and
immediately transported D.R. to the hospital. D.R.'s condition was critical-he had
sustained severe internal injuries, and was not expected to live. 

 Deputy Hooper was the first officer to arrive at G.S.'s home in response to the
"911" call. Hooper saw Turner in the front yard and instructed him to remain at the
scene. After entering the residence to check on D.R., Hooper examined the backyard
for information related to the suspected offense. He heard the sounds of two people
behind the family's fence. When he looked over the fence, he saw appellant and
Turner. Appellant was examining the ground as though he were looking for
something. Deputy Hooper instructed the two men to return to the front of the
residence. Once appellant returned to the house, officers noticed blood on appellant's
pants and boots. An officer had appellant remove his clothing in the backyard to
preserve the clothing for testing purposes. Subsequent DNA testing indicated that the
blood on the clothing contained D.R.'s DNA. 

 While appellant and several officers were in the backyard, one of the officers,
Detective Michael Weinel, stated to the other officers: "It looked like [D.R.] got the
hell beat out of him." Appellant, who was standing nearby, volunteered: "I'm not
going to lie. [G.S.] told me that [D.R.] tried to rape his little sister. That pissed me
off, so I confronted him. When I did, he swung at me and I beat his ass."

 Later, while Deputy Hooper was transporting appellant to jail, appellant asked
Hooper whether "this is a misdemeanor or a felony?" Hooper replied he did not
know and indicated it would depend on the outcome of the investigation. Appellant
then said: "Well, I know I knocked him out. I hit him quite a few times, but after
that, I left, I don't know what happened after that."

II. Analysis 

A. Failure to Submit a Lesser Charge on Aggravated Assault

 In his first point of error, appellant asserts that the trial court committed
reversible error because it failed to submit to the jury a lesser charge on aggravated
assault. Appellant made a timely written request for submission of a lesser-included
offense, aggravated assault by causing serious bodily injury by striking the
complainant with his hand or boot. The State opposed the submission of the lesser-included offense on the basis that "the sole mechanism of causing serious bodily
injury that is in evidence in this case is by the penetration of the Complainant's anus
with a pipe. Also, the only deadly weapon alleged to be used in this case and
supported by the evidence is that same pipe." The trial court denied the requested
instruction.

 Appellant argues that he admitted he had beat up D.R. and that the combined
actions of appellant and Keith Turner prior to the insertion of the umbrella pole into
D.R.'s anus were sufficient to satisfy the element of serious bodily injury so as to
constitute aggravated assault as a lesser included offense of aggravated sexual assault
as alleged in the indictment. (3) Additionally, Appellant claims that the testimony of the
police officers as to the two oral statements made by appellant raises some evidence
that appellant may have committed only an aggravated assault and then left the scene
before the sexual assault occurred. In support of his argument, appellant further notes
that evidence relating to G.S.'s "assaultive behavior," presumably the punch leveled
at D.R., and a foot injury sustained by D.S., were consistent with the kicking of the
pole into the anus of D.R.

 Under the Texas Code of Criminal Procedure, an offense is a lesser-included
offense if: (1) it is established by proof of the same or less than all the facts required
to establish the commission of the offense charged; (2) it differs from the offense
charged only in the respect that a less serious injury or risk of injury to the same
person, property, or public interest suffices to establish its commission; (3) it differs
from the offense charged only in the respect that a less culpable mental state suffices
to establish its commission; or (4) it consists of an attempt to commit the offense
charged or an otherwise included offense. Tex. Crim. Proc. Ann. art. 37.09 (Vernon
2007).

 The Texas Court of Criminal Appeals has recently clarified the method for
determining whether the allegation of a greater offense includes a lesser offense. See 
Hall v. State, 225 S.W.3d 524, 535-36 (Tex. Crim. App. 2007). The Court phrased
the issue as "whether the facts required in Article 37.09(1) are determined by the
evidence adduced at trial, or whether the determination is a question of law that can
be answered before the trial begins by looking at the elements and facts alleged in the
charging instrument." Hall, 225 S.W.3d at 534-35. The Court held that the
"pleadings" approach is the sole test for determining in the first step whether a party
may be entitled to a lesser-included offense instruction. Id. at 535. In describing this
"cognate-pleadings" approach, the Court stated that a court "looks to the facts and
elements as alleged in the charging instrument, and not just to the statutory elements
of the offense, to determine whether there exists a lesser-included offense of the
greater charged offense." Id. at 535-36. The availability of a lesser-included
instruction in a given case depends on the second step, whether there is some
evidence adduced at trial to support such an instruction. Id. 

 The first step in the lesser-included offense analysis, determining whether an
offense is a lesser-included offense of the alleged offense, is a question of law. Id. 
It does not depend on the evidence to be produced at trial. Id. It may be, and to
provide notice to the defendant must be, capable of being performed before trial by
comparing the elements of the offense as they are alleged in the indictment or
information with the elements of the potential lesser-included offense. Id.

 The evidence adduced at trial remains an important part of the trial court's
decision whether to charge the jury on lesser-included offenses. Id. at 536. The
second step in the analysis asks whether there is evidence that supports giving the
instruction to the jury. Id. A defendant is entitled to an instruction on a lesser-included offense where the proof for the offense charged includes the proof necessary
to establish the lesser-included offense and there is some evidence in the record that
would permit a jury rationally to find that if the defendant is guilty, he is guilty only
of the lesser-included offense. Id. In this step of the analysis, anything more than a
scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. Id. 
In other words, the evidence, must establish the lesser-included offense as "a valid,
rational alternative to the charged offense." Id.

 Here, appellant contends that aggravated assault is a lesser-included offense
of aggravated sexual assault. Applying the first step of the lesser included-offense
analysis, we do not consider the evidence that was presented at trial. Instead, we
consider only the statutory elements of aggravated sexual assault as they were
modified by the particular allegations in the indictment:

 (1) appellant;

 (2) unlawfully, intentionally and knowingly;

 (3) caused the penetration of D.R.'s anus;

 (4) by placing a pipe in the anus of D.R.;

 (5) without D.R.'s consent, by compelling D.R. to submit and participate
by using physical force and violence, and

 (6) in the course of the same criminal episode used and exhibited a
deadly weapon, namely a pipe; and

 (7) caused serious bodily injury; and

 (8) attempted to cause D.R.'s death in the course of the same criminal
episode.


Tex. Penal Code Ann. §22.021(a) (Vernon 2007).


 We now compare these charged elements with the elements of the offense of
aggravated assault that could be included in that offense. See Hall, 225 S.W.3d at
536. The statutory elements of that offense as requested by the appellant, are:

 (1) appellant;

 (2) unlawfully, intentionally or knowingly;

 (3) used or exhibited a deadly weapon during the commission of the assault; or

 (4) caused serious bodily injury to D.R. by striking D.R. with his hand or boot.

 

Tex. Penal Code Ann. §22.02(a) (Vernon 2007).

 We then ask the question that article 37.09(1) poses: are the elements of the
purported lesser offense "established by proof of the same or less than all the facts
required to establish the commission of the offense charged?" We hold that in the
instant case, the elements required to prove an aggravated assault are not the same as,
or less than, those required to prove an aggravated sexual assault as alleged in the
indictment. Therefore, appellant's requested instruction does not satisfy the first
prong of the Hall test.

 Appellant seizes upon language in the indictment, as set out above, that
appellant "compelled [D.R.] to submit and participate by the use of physical force and
violence" and that appellant "caused serious bodily injury" to D.R. as providing the
basis for the submission of his requested lesser included offense of aggravated assault
by "causing serious bodily injury by striking [D.R.] with his hand or boot." The
language about compelling submission by the use of physical force and violence
described the manner in which the sexual activity alleged was non-consensual. The
language about causing serious bodily injury described the aggravating factor making
the sexual assault an aggravated sexual assault. Neither description alleged its own
manner and means. Indeed, the only alleged manner and means in the indictment is
"by placing a pipe in the anus" of D.R.

 As previously noted, the determination of whether an offense is a lesser-included offense must be capable of being performed before trial by comparing the
elements of the offense as they are alleged in the indictment with the elements of the
potential lesser-included offense. Hall, 225 S.W.3d at 535-36. The reason is so that
the defendant is given notice of the crime with which he is charged. Id. at 535. The
allegation of manner and means is critical to the analysis, as illustrated by Hall itself. 
In Hall, the alleged manner and means were "by shooting the individual with a gun." 
Id. at 536. The manner and means in the erroneously submitted lesser offense were
by threatening the individual by displaying a deadly weapon, namely a gun. Id. The
Court of Criminal Appeals acknowledged that the evidence may have showed
threatening and display, as well as a number of other offenses, but all of these
offenses were not lesser-included offenses because they were not established by the
same or less than the proof required by the allegations in the indictment. Id. at
536-37. They all required proof of additional facts. Id. at 537.

 Similarly, in the present case, proof of striking D.R. with appellant's hand or
boot was not required in order to prove the alleged offense. For example, the force
and violence alleged to make the sexual activity non-consensual could have been
proved in many ways, such as by burning D.R. on his chest with a cigarette, by
punching D.R., or by slashing D.R. on the chest with a knife--to name a few shown
by the evidence in this case. Of course, there are innumerable other ways force and
violence could have been proved. As for the alleged serious bodily injury, it could
have been proved in many ways, including the injury done to D.R.'s rectum proved
in the trial of this case. Because appellant's request for a lesser-included offense of
aggravated assault included a manner and means of "by striking [D.R.] with
appellant's hand or boot," which were not required to be proved in order to prove the
offense alleged in the indictment, and would have directed the jury's attention to acts
in another portion of the criminal episode independent of the aggravated sexual
assault charged, the trial court properly refused appellant's request for submission of
a lesser-included offense. (4)

 Therefore, the offense of aggravated assault is not a lesser-included offense of
the offense of aggravated sexual assault under the facts of this case. Cf. Trejo v.
State, 242 S.W.3d 48, 50-52 (Tex. App.--Houston [14th Dist.] 2007, pet. granted)
(holding aggravated assault is not a lesser-included offense of aggravated sexual
assault).

 Even assuming appellant were correct in his argument that aggravated assault
is a lesser included offense of aggravated sexual assault, we do not find sufficient
evidence in the record to support such an instruction. In the second step of a lesser
included offense analysis, we must examine the evidence adduced at trial to
determine if there was some evidence to support instructing the jury on the lesser
included offense. Hall, 225 S.W.3d 524 at 536. Appellant claims that his own oral
statements to police that he "beat [D.R.'s] ass," "knocked him out," "hit him quite
a few times," and then left supports a charge on the lesser included offense. 
However, we are not persuaded that speculative inferences drawn from appellant's
oral statements constitute "evidence" for the purpose of our analysis. More
specifically, appellant is not entitled to any presumption that his oral statements were
a complete rendition of his factual involvement in the injuries to D.R. Likewise, we
are not persuaded by appellant's contention that G.S.'s single punch to D.R. and a
foot injury sustained by D.S. would permit a jury rationally to find that if appellant
is guilty, he is guilty only of aggravated assault. Thus, we hold further that appellant
has not offered more than a scintilla of evidence in favor of the requested instruction,
and therefore was not entitled to a lesser charge on aggravated assault under the
second prong of Hall.

 We overrule appellant's first point of error.

B. Failure to Grant a Mistrial Based on Improper Jury Argument

 In his second point of error, appellant argues that the trial court erred in failing
to grant a mistrial after sustaining his objection to the prosecutor's closing argument. 
During his closing argument at the guilt stage of trial, the prosecutor argued as
follows:

 And that leads me to the last item of evidence of guilt that I want to
bring your attention to, and that's simply the Defendant's hatred of
minorities. That's blacks, Mexicans, everyone. And members of the
jury, I want this to be clear. I'm not trying to inflame you or have you
go back there and make a decision based on just the fact that he's a bad
person. We covered this. I still have to prove my case.


 And so, how does the fact he's a skinhead and a Neo-Nazi play into it? 
Why do I bring that? Am I just trying to throw that card out there and
get ya'll mad at him? No. [D.R.] is Hispanic. David Tuck called him
a Hispanic wetback while he was there. [D.R.] took offense to that,
understandably. And then, after an allegation that [D.R.] had tried to
kiss [D.S], who David Tuck thinks is a white girl, he goes crazy on him.

 

 Is that really that far-fetched, that that's the motivation for the attack. 
I mean, how many times, how many bad things, whether it's beatings or
lynchings or worse have been- 


 The prosecutor's last statement was interrupted by appellant's objection that
the prosecutor's comment was outside the record. The trial court sustained the
objection and instructed the jury to disregard as follows: "The last statement by the
prosecutor has no place in this trial. It's not connected in any way. You will not
consider that last statement in any way during your deliberations." The trial court
then denied appellant's motion for a mistrial. 

 Appellant contends that the prosecutor's incomplete statement regarding
"beatings or lynchings or worse . . ." was improper because it is not supported by the
evidence and that the trial court abused its discretion in denying appellant's request
for a mistrial. 

 There are four areas of proper jury argument: (1) summation of the evidence,
(2) reasonable deductions from the evidence, (3) responses to opposing counsel's
argument, and (4) pleas for law enforcement. Perry v. State, 977 S.W.2d 847, 850 
(Tex. App.--Houston [14th Dist.] 1998, no pet.). An attorney may not inject
speculative evidence outside the record into his or her jury argument. Everett v. State,
707 S.W.2d 638, 640-41 (Tex. Crim. App. 1986). However, attorneys may draw all
reasonable, fair, and legitimate inferences from the facts in evidence. Williams v.
State, 688 S.W.2d 486, 491 (Tex. Crim. App. 1985). Additionally, even aggressive
arguments are permissible so long as the arguments fall within one of the four areas
of proper jury argument. See Berry v. State, 233 S.W.3d 847, 860 (Tex. Crim. App.
2007). 

 When, as here, the trial court sustains an objection and instructs the jury to
disregard, but denies a defendant's motion for a mistrial, the issue is whether the trial
court abused its discretion in denying a mistrial. Hawkins v. State, 135 S.W.3d 72,
77 (Tex. Crim. App. 2004). In determining whether the trial court abused its
discretion in denying the mistrial, we balance three factors: (1) the severity of the
misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of
conviction absent the misconduct. Id. Only in extreme circumstances, when the
prejudice is incurable or the comment is "so prejudicial that expenditure of further
time and expense would be wasteful and futile," will a mistrial be required. Id. at 77.

 The allegedly improper argument only occurred at one point during the
prosecutor's argument and was not pursued or emphasized. In fact, because
appellant's objection interrupted the State's argument, the record does not reveal
whether the argument was going to be within one of the approved areas. See Pace v.
State, No. 01-04-00518-CR, 2007 WL 2963746, at *3 (Tex. App.--Houston [1st
Dist.] Oct. 11, 2007, no pet) (not designated for publication). Even assuming the
State was about to make an improper statement outside the record, not only did the
trial court sustain appellant's objection, but it quickly and decisively instructed the
jury to disregard the argument. See Gardner v. State, 730 S.W.2d 675, 696 (Tex.
Crim. App. 1987). Therefore, the trial court did not abuse its discretion in denying
appellant's motion for mistrial.

 We overrule appellant's second point of error.

C. Failure in Admission of Evidence Regarding Appellant's White
Supremacist Affiliation


 In his third point of error, appellant contends that the trial court erred in
admitting certain evidence during the guilt-innocence phase of trial regarding
appellant's skinhead and neo-Nazi affiliation. During a pretrial hearing, the
prosecutor made the following proffer:


 . . . the evidence the State would proffer is the following: That
immediately preceding the assault on the Complainant in this case,
according to one of the witnesses, [G.S.], this Defendant made some
kind of offensive remark of a racist nature which was the beginning of
ill feelings between him and the Complainant. After that time, his
little sister made an allegation that the Complainant had tried to kiss
her, whereupon this Defendant began to assault him.

 

 The testimony is going to be during the course of that assault, this
Defendant called the Complainant a wetback, other racial slurs. And
also, while assaulting him, uttered the phrase, white power, which is
a phrase associated with white supremacist groups and meant in that
context. 


 There is going to be testimony that he said to G.S during the course of
the assault: If you had any white in you, you would be helping me. 
And, basically, we are going to show that his intent and motive in
committing this assault, to the extent which it happened, and to the
severity with which it happened, was motivated by racial hatred.


 You're also going to hear testimony-or we would also proffer
testimony from the crime scene officer who collected certain items of
evidence from this Defendant, including two boots, at least one of
which he used to kick the Complainant and kick the pole into his
rectum. One of those boots has drawn on it a swastika, which the
crime scene unit officer was able to see once he got them off and
examined them.


 And also, he is going to testify that he confiscated this Defendant's
wallet after he was arrested, found a swastika insignia carved into it,
found pictures of other skinheads in the wallet. Backing up for a
second, G.S. is going to testify that he's known [appellant] for a short
time, but in that short time he's known him, he knows him to be a
skinhead, he has that reputation. And he claims-a skinhead meaning
a member of a white supremacist racist group.


 Finally, Judge, the evidence is going to show [appellant] has on his
body tattoos of swastikas and other neo-Nazi and white supremacist
slogans and codes. That would be interpreted by a deputy from the
Harris County Sheriff's Department, Michael Squires, who
photographed those tattoos and interviewed [appellant] about them. 
We are not getting into the contents of the interview, but he can testify
as to the meaning of the tattoos and their significance. (5)


 The State offered this evidence as an exception to Rule 404(b) "for motive and
intent in committing the assault." The trial court overruled appellant's objection to
the States' proffer on the grounds that the evidence was relevant and that the
probative value of the evidence outweighed the prejudicial effect. The trial court also
granted appellant a running objection to the introduction of all evidence pertaining
to appellant's white supremacist affiliation.

 During the guilt-innocence phase of the trial, G.S. testified that appellant is a
"racist" and a "skinhead" who "doesn't [sic] like anyone who's not white." G.S.
testified further that appellant called D.R. a "wetback" and uttered the terms "white
power," "beaner" and "wetback" while stomping D.R.. Finally, G.S. testified that
appellant told G.S. during the assault "if you were white, you would be helping me." 
D.S. also testified that she heard appellant utter the terms "white power" and
"wetback."

 Other evidence produced at the guilt-innocence phase of trial included
appellant's three tattoos-a swastika surrounded by a wreath, a swastika below the
word "HEIL," and the phrase "SKIN FOR LIFE." The State also presented evidence
of appellant's boot and wallet, which both bore an image of a swastika.

 We review a trial court's decision to admit evidence under an abuse of
discretion standard. Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003);
Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); Narvaiz v. State,
840 S.W.2d 415, 429 (Tex. Crim. App. 1992). The trial court does not abuse its
discretion unless its determination lies outside the zone of reasonable disagreement. 
Montgomery v. State, 810 S.W.2d 372, 392 (Tex. Crim. App. 1991) (op. on reh'g).

 1. Relevancy

 Appellant argues that the evidence relating to his skinhead affiliation was not
relevant to the offense charged and that the State was "trying to conduct a mini-trial
on [appellant's] associations and tattoos." Appellant also claims that the attack was
not racially motivated, and that G.S. and D.S. both had reasons to lie in their
testimony. 

 At trial, all relevant evidence is admissible unless otherwise excepted by the
Constitution, statute, or other rules. See Tex. R. Evid. 402. Evidence is relevant if
it has any tendency to make more probable or less probable the existence of a
consequential fact. See Tex. R. Evid. 401; Chaddock v. State, 203 S.W.3d 916, 923
(Tex. App.-- Dallas 2006, no pet.) Not all relevant evidence is admissible. 
Chaddock, 203 S.W.3d at 923. 

 Gang membership evidence is admissible under Texas Rule of Evidence
404(b) if it is relevant to show a non-character purpose that in turn tends to show
commission of the crime. See Tibbs v. State, 125 S.W.3d 84, 88. Gang membership
is admissible to show bias, motive, intent, or to refute a defensive theory. See Tibbs,
125 S.W.3d at 88 (citing United States v. Sargent, 98 F.3d 325, 328 (7th Cir. 1996);
Stern v. State, 922 S.W.2d 282, 287 (Tex. App.--Fort Worth 1996 pet. ref'd)). See
also Vasquez v. State, 67 S.W.3d 229, 239 (Tex. Crim. App. 2002) (holding
defendant's Mexican Mafia affiliation admissible to show defendant's motive for
killing victim); King v. State, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (holding
extensive evidence of appellant's hatred for African-Americans, including his
"graphic" tattoos and drawings was evidence that appellant had motive to kill
complainant because of complainant's race); Chaddock, 203 S.W.3d at 925-27
(holding transcript of an interview appellant's associate gave for broadcast on a
skinhead radio program relevant and probative for purposes of showing assault
committed by appellant was a gang activity); Williams v. State, 974 S.W.2d 324, 331
(Tex. App.-- San Antonio 1998, pet. ref'd) (holding evidence of defendant's gang
affiliation admissible to establish motive for robbery); Brosky v. State, 915 S.W.2d
120, 134-35 (Tex. App.-- Fort Worth 1996, pet. ref'd) (holding no error in admitting
racist propaganda as evidence that murder was committed by combination animated
by white supremacist beliefs); McKnight v. State, 874 S.W.2d 745, 747 (Tex.
App.--Fort Worth 1994, no pet.) (holding defendant's and witness's gang
membership admissible to show defendant's bias).

 In the present case, evidence of appellant's association with white
supremacists and racist beliefs was relevant because it provided the motive for
appellant's violent assault on D.R.. According to appellant's brief, appellant
overheard D.S. say that D.R. tried to kiss her. He confronted D.R., and they fought. 
Id. The State's theory of the case was that the assault on D.R. was motivated by
appellant learning that the complainant had attempted to kiss D.S. Specifically, it was
appellant's racially-influenced perception of the attempted kiss--namely that D.R.
was attempting to kiss someone outside of D.R.'s own race--that motivated appellant
to attack D.R. in such a vicious manner.

 The evidence showed that, prior to the assault, appellant had a brief
confrontation with D.R. during which appellant called D.R. a "wetback." During the
assault, appellant uttered the terms "white power," "beaner," and "wetback." (6) The
State also presented evidence that appellant told G.S. that if he were white, G.S.
would be helping appellant assault D.R.. Based on appellant's use of racial slurs
before and during the commission of the assault, we cannot say the trial court abused
its discretion in finding such evidence relevant for the purpose of demonstrating a
motive for appellant's assault on D.R..

 Appellant also argues the evidence was inadmissible because it tended to show
appellant's guilt by association with skinheads and neo-Nazis. The cases cited by
appellant hold evidence that tends to show guilt by association is inadmissible
because it has no bearing on the accused's guilt or innocence. See generally Gant v.
State, 513 S.W.2d 52, 53 (Tex. Crim. App. 1974); United States v. Parade-Talamantes, 32 F.3d 168, 169-70 (5th Cir. 1994); United States v. Roark, 924 F.2d
1426, 1430-34 (8th Cir. 1991); United States v. Romo, 669 F.2d 285, 287-290 (5th
Cir. 1982). As previously noted, the facts of this case, however, make evidence of
appellant's association with skinhead and or neo-Nazi organizations admissible to
prove appellant's motive for the assault.

 2. Unfair Prejudice

 Finally, appellant contends that, even if evidence of his racism was relevant,
it should have been excluded because its probative value was substantially
outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. As the Court of
Criminal Appeals has noted, to violate Rule 403, it is not enough that the evidence
is "prejudicial"-it must be unfairly prejudicial. Vasquez, 67 S.W.3d at 240 (citing
Rogers v. State, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999)). Unfair prejudice
occurs when the evidence has "an undue tendency to suggest decision on an improper
basis, commonly, though not necessarily, an emotional one." Id. Here, the potential
improper basis would be the use of appellant's skinhead and neo-Nazi affiliation to
show that appellant was a bad person and that he acted in conformity with his bad
character. See id. 

 In making a determination under Rule 403, we take into account several
factors: (1) how compelling the evidence serves to make more or less probable a fact
of consequence; (2) the potential of the genre of evidence to impress the jury in some
irrational but nevertheless indelible way; (3) how much trial time is consumed; and
(4) how great the proponent's need is for this evidence. Montgomery v. State, 810
S.W.2d 372, 389-90; Hernandez v. State, 891 S.W.2d 744, 748 (Tex. App.--Fort
Worth 1994, pet. ref'd). Considering these factors, the trial court did not err in
finding that this potential character conformity inference does not substantially
outweigh the relevant purpose of showing motive for the aggravated sexual assault. 
67 S.W.3d at 240. 

 First, as previously noted, evidence of appellant's skinhead and neo-Nazi
affiliation was probative for establishing the motive for the assault. Second, the
record does not support the notion that the evidence would tend to impress the jury
in some irrational and indelible manner. The trial court instructed the jury to consider
appellant's other bad acts only for the purposes of determining the motive and intent
of appellant in connection with the instant offense. We presume the jury followed the
trial judge's instructions. Thrift v. State, 176 S.W.3d 221, 224 (Tex. Crim. App.
2005). Consequently, we cannot say the jury was influenced by the evidence in an
irrational and indelible manner.

 Third, the evidence of appellant's beliefs concerning race and his affiliation
with white supremacist groups was developed quickly. In response to a limited series
of questions, Harris County Sheriff's Deputy Sean Carrizal testified as to the swastika
symbol on appellant's left boot and wallet. G.S. testified briefly about appellant's
view on race, admitted skinhead affiliation, use of the term "wetback" prior to the
assault, and racist statements during the assault. Finally, in response to a single
question regarding what appellant said during the assault, D.S. testified he said "white
power" and wetback." Therefore, the record does not indicate a disproportionate
amount of time was spent on this line of questioning.

 Fourth, although the evidence was not essential to the State's case, it was
probative for establishing appellant's motive for the assault as well as its wanton
cruelty. Thus, the State had a compelling reason to present such evidence.

 In light of the relevancy of the evidence and our analysis under Rule 403, we
hold the trial court's determination to admit the evidence pertaining to appellant's
skinhead and neo-Nazi affiliation does not fall outside of the zone of reasonable
disagreement. Weatherred, 15 S.W.3d at 542. Therefore, we overrule appellant's
third point of error. 

D. Failure to Grant Appellant's Motion to Suppress (7)

 In his fourth point of error, appellant contends the trial court erred in denying
his motion to suppress two of his oral statements. (8) Specifically, appellant argues that
deputies illegally detained him to answer questions about the aggravated sexual
assault of D.R.. (9)

 1. Standard of Review

 We review the trial court's ruling on a motion to suppress for abuse of
discretion. State v. Dixon, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); State v.
Garrett, 177 S.W.3d 652, 655 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd). A
trial court abuses its discretion by not suppressing illegally obtained evidence, which
is rendered inadmissible by article 38 of the Texas Code of Criminal Procedure.
Garrett, 177 S.W.3d at 655; see Tex.Code Crim. Proc. Ann. art. 38.23 (Vernon
2007). We view the record in the light most favorable to the trial court's ruling, and
we will reverse the trial court's determination only if it is "outside the zone of
reasonable disagreement." Dixon, 206 S.W.3d at 590. We will sustain the lower
court's ruling if it is reasonably supported by the record and is correct on any theory
of law applicable to the case. Dixon, 206 S.W.3d at 590. We defer almost totally to
a trial court's express or implied determination of historical facts, but we review de
novo the court's application of the law of search and seizure to those facts. Id.
 2. Appellant's Statements

 Deputy Hooper testified at the suppression hearing that he arrived at G.S.'s
home shortly after 9:45 a.m. in response to a call involving an aggravated assault. 
Turner was in the front yard when the officer arrived. From prior encounters, Deputy
Hooper knew Turner did not live at the residence, so he instructed Turner to remain
at the scene and then entered the house in search of a victim. He located D.R. in the
kitchen and noted D.R. had suffered severe trauma to his chest and face. 

 Deputy Hooper and a second deputy, Robert Avila, went outside to investigate
the backyard after G.S.'s mother informed the officers that D.R. was discovered there. 
The officers found an area in the backyard where the grass was compressed and a
small amount of blood was present. They also located D.R.'s shoe near the back
fence. 

 While the officers were examining the scene, they heard two voices from the
bayou behind the back fence. The officers looked over the fence and spotted
appellant and Turner. Appellant was examining the ground as if he were looking for
something and Turner was sitting on a bicycle watching him. Once the officers
looked over the fence, though, appellant and Turner began walking away. Concerned
that Turner and appellant were disturbing evidence, the officers instructed them to
return to the front of the house. Deputy Avila then drove around the bayou "and met
them halfway and followed them back to the house."

 When appellant and Turner entered the backyard, Deputy Hooper noticed a red
splatter on appellant's pants leg that appeared to be blood. Based on this observation
and the complainant's condition, Deputy Hooper advised appellant of his article
38.22 rights and asked him about the blood on his pants. After appellant stated that
he wanted to consult with a lawyer, Deputy Hooper did not ask him any more
questions. 

 Detective Weinel arrived at the scene at about 1:00 p.m. and found appellant
in the backseat of a patrol car. The detective escorted appellant to the backyard to
remove his clothing, which he intended to preserve for evidentiary purposes. While
standing in the backyard with a group of other officers, Detective Weinel stated to
Deputy Hooper, "looks like the Complainant got the hell beat out of him." Appellant
was standing within "earshot" and spontaneously stated, "I'm not going to lie. [G.S.]
told me that kid tried to rape his little sister. That pissed me off, so I confronted him. 
When I did, he swung at me, so I beat his ass." Appellant then told Detective Weinel
he wanted to tell his side of the story and the detective informed appellant that they
could discuss it later. 

 Later, while Deputy Hooper was transporting appellant to jail, appellant asked
Hooper whether the crime was a misdemeanor or a felony. Deputy Hooper replied
that it would depend on the outcome of the investigation. Appellant then stated,
"well, I hit him in the face quite a few times, I know he was knocked out, but after
that, I left, I don't know what happened after that." The following day, appellant
provided two videotaped interviews at the police station.

 3. Was the Detention Illegal?

 On appeal, appellant argues the trial judge erred in denying his motion to
suppress the oral statements. Specifically, he contends that he was illegally detained
and that his oral statements at the scene of the aggravated sexual assault and during
his transport to the police station, were the unlawful fruits of his illegal detention.

 Appellant states that, when officers discovered appellant and Turner behind
the fence of the crime scene, "[n]either young man was involved in any criminal
activity, and they voluntarily walked around the fence to the front of the home" at the
officer's request. According to appellant's recitation of the testimony, when an
officer saw the blood on appellant's pants, and appellant made the statement that he
had defended himself after the initial verbal confrontation with D.R., the officer
detained him.

 To the contrary, we find upon review of the record that appellant was the
subject of an investigatory detention when he returned to G.S.'s front yard after being
instructed to do so by the officers who found him behind the fence. See Johnson, 912
S.W.3d at 236. Appellant states the detention was not justified because "the fact that
he and Turner were talking behind the fence outside of the yard where D.R. was
found and the fact that they were not the subject of any criminal activity" did not give
police reasonable suspicion or probable cause for their detention and questioning. In
support of this, appellant cites Johnson v. State, 912 S.W.2d 227 (Tex. Crim. App.
1995), which held a temporary detention is not permitted unless the circumstances on
which the officers relied objectively support a reasonable suspicion that the person
detained actually is, has been, or will be engaged in a criminal activity. 

 Additionally, appellant cites Woods v. State, 956 S.W.2d 33 (Tex. Crim. App.
1997), which articulates the standard that temporary detention is to be examined in
terms of the totality of the circumstances and will be justified when the detaining
officer has specific articulable facts, which, taken together with rational inferences
from those facts, lead the officer to conclude that the person detained is, has been, or
will be soon engaged in criminal activity. Appellant does not explain how the facts
in Johnson or Woods operate in favor of the exclusion of appellant's oral statements.

 A police officer may stop and briefly detain a person for investigative
purposes if the officer, in light of his experience, has a reasonable suspicion
supported by articulable facts that criminal activity may be afoot. Terry v. Ohio, 392
U.S. 1, 30, 88 S.Ct. 1868, 1884-85 (1968). The reasonableness of a temporary
detention must be examined in terms of the totality of the circumstances. Woods, 956
S.W.2d at 38. A temporary detention is justified when the detaining officer has
specific, articulable facts at the time of the detention which, taken together with
rational inferences from those facts, lead him to conclude that the person detained is,
has been, or soon will be engaged in criminal activity. Id. A reasonable suspicion
means more than a mere hunch or suspicion. Davis v. State, 947.

 In support of its argument that the detention was justified, the State cites 
Mays v. State, 726 S.W.2d 937 (Tex. Crim. App. 1986) and Davis v. State, 783
S.W.2d 313 (Tex. App.--Corpus Christi 1990, pet. ref'd). In Mays, a police officer
received a radio call regarding a burglary at a particular apartment. Mays, 726
S.W.2d at 943. When the officer arrived at the apartment, he saw one man standing
at the apartment's front door and a second man sitting on the steps leading up to the
apartment. Id. After the men confirmed they were together, the officer ordered them
to come to him and they complied. Id. The officer then detained them. Id. The
Court of Criminal Appeals determined the officer was justified in detaining the men
since he reasonably believed they might have been involved in the recent burglary. 
Id. at 944.

 Similarly, in Davis, a police officer was responding to a burglary alarm when
he saw the defendant riding a bicycle down the middle of the street about two blocks
away from where the alarm was activated. Davis, 738 S.W.2d at 315-17. The officer
suspected the defendant might have been involved in the burglary so he stopped him
and requested identification. Id. at 317. The court of appeals determined the officer
was entitled to detain the defendant to determine his identity and maintain the status
quo considering his proximity to the crime scene. Id.

 As in Davis and Mays, it was reasonable for officers to suspect that appellant
was involved in D.R.'s assault and to temporarily detain him for further investigation. 
At the time he was detained, the police had the following information:

 1. After confirming D.R. had been the subject of a severe assault
and finding evidence of that assault in the backyard, Deputy Hooper
discovered appellant behind the fence of the crime scene. 

 

 2. Hooper observed appellant searching for something on the
ground behind the crime scene. When Hooper looked over the fence,
appellant and Turner started walking away in the opposite direction. 


 Given these circumstances, we hold that the police had "specific, articulable
facts" sufficient to temporarily detain appellant. Appellant and Turner were found
in the vicinity of the crime when officers arrived on the scene. Furthermore, the
deputies' testimony revealed that appellant was acting suspiciously by looking for
something on the ground behind a fence near the crime scene. The officers could
have reasonably suspected appellant was searching for some incriminating evidence
that he may have left behind during the commission of the offense. Finally, when
appellant saw the officers, he started walking away. Consequently, it was reasonable
for officers to suspect appellant had been involved in the aggravated sexual assault,
and appellant's temporary detention was justified.

 We overrule appellant's fourth point of error.

III. Conclusion



 We affirm the judgment of the trial court.


 

 

 Davie L. Wilson

 Justice 



Panel consists of Justices Nuchia, Higley, and Wilson. (10)


Do not publish. See Tex. R. App. P. 47.2(b).








1. The facts set forth in this opinion represent those facts as presented by the testimony
of G.S., D.S., and their mother, Deputies Avila, Schield, Weinel and Hooper,
appellant, Holly Kaphinski, and Crime Scene Unit Investigator Sean Carrizal.
Ritcheson testified that he had no memory whatsoever of meeting up with G.S. to go
to the crawfish festival, and that the first thing he remembered was waking up in the
hospital bed.
2. G.S.'s mother had returned from the store after midnight and was sleeping upstairs. 
3. According to appellant, the actions of Turner and appellant sufficient to satisfy the
element of serious bodily injury for the purposes of an aggravated assault charge
include the evidence that Turner punched D.R., that appellant kicked D.R. about 10
times in the head and torso with steel-toed boots, that appellant and Turner burned
D.R.'s chest with a cigarette, and that appellant slashed D.R. on the chest with a knife
immediately before placing the sharp end of the umbrella pole into D.R.'s anus.
4. The indictment alleged appellant's participation in the aggravated sexual assault. The
appellant's submitted charge suggests he was not present at the time the aggravated
sexual assault was committed on D.R., a proposition inconsistent with the
fundamental notion of a lesser included offense, but consistent with the notion of a
different offense.
5. Consistent with the State's proffer, Mike Squyres, a deputy with the Harris County
Sheriff's department who specialized in the identification of gangs, testified about the
meaning of appellant's tattoos at the punishment phase of trial.
6. G.S. Testified that he understood the term "beaner" to mean a "Mexican cholo,"
which is a racial slur.
7. Appellant states the trial court erred in denying his "Rule 404 and 403 motion to
suppress his two oral statements." Tex. R. Evid. 403, 404. However, in his brief,
appellant does not frame his argument on his motion to suppress under the rubric of
these rules nor does he cite to these rules. We assume appellant objects to the
admission of the evidence based on the authority cited in appellant's brief.
8. At trial, appellant sought to exclude two videotaped interviews that occurred at the
police station and certain physical evidence obtained in G.S.'s backyard. For the
purposes of this appeal, appellant urges the "voluntary statements" given by him,
presumably the statement in G.S.'s backyard, and the statement in the patrol car en
route to the police station, were not admissible because his detention was
unreasonable under the totality of the circumstances. Appellant does not argue on
appeal that his arrest was unlawful.
9. The State argues that appellant waived any error in the trial judge's ruling because his
appellate argument in favor of suppressing the oral statements is inconsistent with
appellant's argument at trial. However, after reviewing the record, we find the
appellant's argument on appeal comports with the corresponding oral argument at the
pre-trial hearing on appellant's "Motion to Suppress Evidence," which urged the oral
statements obtained as a result of appellant's detention should be suppressed pursuant
to the Fourth Amendment to the U.S. Constitution, Article 1, section 9 of the Texas
Constitution, and articles 1.06 and 38.23 of the Texas Code of Criminal Procedure. 
See U.S. Const. amend. IX, Tex. Const. art. I, §9, Tex. Code Crim. Proc. Ann. art.
1.06 (Vernon 2007), and Tex. Code Crim. Proc. Ann. art 38.23 (Vernon 2007). See
Tex. R. App. P. 33.1(a)(1)(A).
10. The Honorable Davie L. Wilson, retired Justice, First Court of Appeals, participating
by assignment.